**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**TIMOTHY L. TURNER**                                                                    **PLAINTIFF**

**V.**                                                                    **NO. 4:15-CV-81-DMB-JMV**

**HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY**                                                                    **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Hartford Life & Accident Insurance Company terminated Timothy L. Turner's long term disability benefits based on its determination that Turner was able to perform a job with comparable pay commiserate with his functional capabilities. Following an unsuccessful appeal to Hartford, Turner initiated this suit against Hartford, alleging a wrongful denial of benefits under the Employee Retirement Income Security Act. Turner and Hartford have filed cross-motions for summary judgment, both of which, at the parties' request, this Court interprets as motions for judgment on the record. Because the Court finds Hartford's termination of Turner's benefits supported by substantial evidence and not arbitrary and capricious, the Court may not overturn Hartford's decision to terminate Turner's disability benefits.

## I
### Procedural History

On June 26, 2015, Timothy L. Turner filed a complaint in this Court against Hartford Life & Accident Insurance Company ("Hartford"), asserting three claims under the Employee Retirement Income Security Act ("ERISA"): (1) wrongful denial of benefits; (2) breach of fiduciary duty; and (3) intentional interference with ERISA rights. Doc. #1. On July 28, 2015, Turner amended his complaint as of right. Doc. #6. The amended complaint asserts only a single ERISA claim – wrongful denial of benefits. *Id.*

On April 12, 2016, Hartford moved for summary judgment on Turner's remaining claim. Doc. #24. The same day, Turner filed a cross-motion for summary judgment. Doc. #27. On April 22, 2016, Turner filed an unopposed motion seeking an extension of the deadline to respond to Hartford's summary judgment motion. Doc. #29.

On April 26, 2016, Hartford responded in opposition to Turner's summary judgment motion and filed a motion to strike certain exhibits attached to it. Doc. #30; Doc. #32. Two days later, this Court denied Turner's motion for an extension.[1] Doc. #33. Turner responded in opposition to Hartford's summary judgment motion on May 2, 2016,[2] Doc. #35, but did not respond to the motion to strike. Hartford replied in support of its summary judgment motion on May 9, 2016. Doc. #39.

On August 11, 2016, the parties, after consultation with United States Magistrate Judge Jane M. Virden, submitted to the Court a proposed pretrial order which waives the right to trial and asks the Court to convert the cross-motions for summary judgment to motions for judgment on the record. *See* Doc. #43. The Court approved and entered the pretrial order on March 10, 2017. Doc. #44.

## II
## Motions for Judgment on the Record

The parties have asked the Court to treat the cross-motions for summary judgment as motions for judgment on the administrative record. A "motion for judgment on the

---

[1] The Court found Turner failed to meet the standard of Federal Rule of Civil Procedure 6(b).

[2] Turner filed his response three days after the deadline, without at any point renewing his motion for an extension. Nevertheless, insofar as Hartford replied to the brief, and because the submission of this case on the motion papers equates to a bench trial, the Court will, in the interests of deciding the issues on their merits, consider the untimely brief. *See Miller v. Am. Int'l Grp., Inc.*, No. 3:04-cv-1417, 2006 WL 740936, at *1 n.1 (N.D. Tex. Mar. 14, 2006) ("While Plaintiff's Brief is untimely, the Court will consider it in the interests of deciding the Motions on the merits. Defendants filed a Reply on January 3, 2006."); *see also S. Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc.*, 921 F.Supp.2d 548, 563 (E.D. La. 2013) (considering untimely motion for summary judgment because "a minor delay should not be dispositive of the motion, especially where the Court will ... have to decide the issues presented on virtually the same record as that presented here").

administrative record" is "a motion that does not appear to be authorized in the Federal Rules of Civil Procedure." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (internal quotation marks omitted). However, "it may be appropriate for the district court to treat such a motion as requesting essentially a bench trial on the papers with the District Court acting as the finder of fact. In that scenario, the district court may make factual findings, but it must be clear that the parties consent to a bench trial on the parties' submissions." *O'Hara v. Nat'l Union Fire Ins. Co. of Pitt.*, 642 F.3d 110, 116 (2d Cir. 2011) (internal quotation marks and citations omitted).

It is clear the parties here have consented to a bench trial on their submissions based on the pretrial order submitted. Accordingly, the Court will treat the parties' motions for summary judgment as motions for judgment on the record and will decide them as the finder of fact.

## III
## Factual Background

### A. The Group Long-Term Disability Policy

Turner is an approximately 48-year old male who was employed in the security and alarms business from 1994 until 2011. AR-308, 743.[3] During the time period relevant to this suit, Tyco International Management Company maintained a Group Long-Term Disability Policy ("Policy") through Hartford applicable to Turner. *Id.* at 001.

Under the terms of the Policy, Hartford had "full discretion and authority to make an initial determination and interpretation of the terms and provisions of The Policy." *Id.* at 030.

Of relevance here, the Policy includes the following provisions:

**Disability Benefit:** *What are my Disability Benefits under the Policy?*

---

[3] Citations to "AR" refer to the administrative record, followed by a page number, such that "AR-001" refers to the first page of the administrative record. The page numbers referenced are the bates numbers printed on each page preceded by the prefix "Hartford/Turner." The entirety of the administrative record was filed in two parts as exhibits to Hartford's summary judgment motion. *See* Doc. #24-2; Doc. #24-3.

We will pay You a Monthly Benefit if You:
1) become Disabled while insured under The Policy;
2) are Disabled throughout the Elimination Period;
3) remain Disabled beyond the Elimination Period; and
4) submit Proof of Loss to Us.

\* \* \*

**Termination of Payment:** *When will my benefit payments end?*
Benefit payments will stop on the earliest of:
1) the date You are no longer Disabled;
2) the date You fail to furnish Proof of Loss;
3) the date You are no longer under the Regular Care of a Physician;

\* \* \*

**Any Occupation** means any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:
1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or
2) the Maximum Monthly Benefit.

\* \* \*

**Disability** or **Disabled** means You are prevented from performing one or more of the Essential Duties of:
1) Your Occupation during the Elimination Period;
2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) after that, Any Occupation.

\* \* \*

**Essential Duty** means a duty that:
1)  is substantial, not incidental;
2)  is fundamental or inherent to the occupation; and
3)  cannot be reasonably omitted or changed.
Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty.

\* \* \*

**Your Occupation** means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location.

*Id.* at 022, 024, 030–031, 034.

## B. Turner's Initial Health Problems

In May 2005, Turner underwent cervical spine surgery. *Id.* at 360. Following surgery, Turner developed moderate paresis of the right true vocal cord. *Id.* On June 9, 2006, Turner was seen by John Schweinfurth, M.D., for a follow-up of the right true vocal cord paresis. *Id.* Schweinfurth observed that the vocal cord paresis had resolved but noted that Turner had "problems with inflammation of both vocal cords." *Id.* at 361. At a follow-up appointment three weeks later, Schweinfurth diagnosed Turner with dysphonia, "likely secondary to right vocal strain and synkinesis." *Id.* at 362. Approximately one month later, on July 25, 2006, Turner returned to Schweinfurth. *Id.* at 365. Schweinfurth found that Turner "seems to be doing well at this point and progressing well. We will have him follow up in our clinic on as needed basis." *Id.*

On February 22, 2008, Turner was evaluated by Rahul Vohra, MD, based on "complaints of back pain and intermittent bilateral leg tingling." *Id.* at 645–46. Turner saw Vohra throughout 2008 and, sometime between October 31, 2008, and January 15, 2009, underwent surgery and decompression on his back. *Id.* at 638–646. On January 15, 2009, Vohra observed that Turner "is doing significantly better from a radicular perspective status post lumbar decompression." *Id.* at 638. Throughout 2009 and into 2010, Turner returned to Vohra with a variety of complaints, including neck pain, back pain, leg pain, and depression. *Id.* at 631–38.

## C. Long Term Disability Approval

In 2010, Turner held the position of a Rep-Core Account Executive with Tyco. AR- 861. On April 6, 2010, Turner presented to Vohra with "increasing neck and back pain." *Id.* at 631. Turner reported to Vohra that "[h]e drives a great deal at work and … has had significant

difficulty with this." *Id*. Turner told Vohra that "[h]e stopped working about two weeks ago." *Id*.

On June 18, 2010, Turner returned to Vohra complaining "of neck pain as well as low back pain." *Id*. at 865. A month later, on July 16, 2010, he presented to Vohra with "axial cervical pain, lumbar pain, and rare tingling in both feet." *Id*. at 863. Vohra observed diminished lumbar range and reflexes, and completed a "Release to Return to Work Status: Short Term Disability" form stating that Turner was not released to return to full duty or light duty. *Id*. at 864. Sometime later, Turner began receiving short term disability benefits. *Id*. at 242.

In August 2010, Turner contacted Hartford about obtaining long term disability ("LTD") benefits. *Id*. at 150. However, on October 4, 2010, Turner informed Hartford that he had been cleared to return to work with no formal restrictions or limitations. *Id*. at 148. The same day, Hartford denied Turner's application for long term disability. *Id*. at 236–38.

On October 7, 2010, Turner reopened his long term disability claim. *Id*. at 141. Hartford approved the claim on December 9, 2010. *Id*. at 232–34. The approval lists a disability date of April 7, 2010, and an effective date of October 30, 2010. *Id*. at 235.

### D. First Functional Evaluation and Award of Social Security Benefits

On August 5, 2011, Vohra, at Hartford's request, completed an "Attending Physician's Statement of Functionality" ("APS") for Turner. AR-718. In the APS, Vohra noted that Turner: (1) could "rarely" lift/carry up to ten pounds; (2) could never lift or carry anything heavier than ten pounds; (3) could never bend at the waist, kneel, or crouch; (4) could occasionally drive; (5) could never reach above the shoulder or below the waist; and (6) could occasionally (defined as 1–33%) finger/handle. *Id*. at 717. The APS reported that Turner did not suffer from a psychiatric/cognitive impairment. *Id*. at 716.

On November 10, 2011, Turner attended a follow-up appointment with Vohra, during which Vohra observed that Turner "continues to have moderate cervical paraspinal spasm with diminished cervical range of motion." *Id*. at 586. Vohra noted that Turner reported increasing pain with the change in weather but an improvement in his depression symptoms, which he believed to be due to counseling. *Id*. Turner informed Vohra that he was attending his children's ballgames and was "going for a walk everyday." *Id*.

On January 31, 2012, the Social Security Administration found Turner to be entitled to monthly disability benefits based on a disability which began April 3, 2010. *Id*. at 677.

On March 1, 2012, Turner returned to Vohra. *Id*. at 585. Turner reported attending counseling and taking hydrocodone and Zoloft. *Id*. Vohra noted that Turner's "functional level is very good" but that "occasionally, … [Turner] will have to significantly limit his activities secondary to neck pain." *Id*. Turner informed Vohra that "[d]riving still consistently causes significant pain." *Id*. Vohra concluded that Turner was "stable" and was "doing well from the standpoint of his depression with the Zoloft and his pain is well controlled with the hydrocodone." *Id*.

On March 12, 2012, Vohra submitted to Hartford an "Attending Physician's Statement of Continued Disability." *Id*. at 662–63. The statement contains the same restrictions set forth in Vohra's August 5, 2011, assessment, including the conclusion that Turner does not suffer from a cognitive or psychiatric impairment. *Id*. On March 27, 2012, Hartford wrote to Vohra to ask him to "explain the medical reasoning that [Turner] is only able to reach occasionally at waist/desk level and do occasional fingering and handling." *Id*. at 659. Vohra responded, "[Turner] has had a 2 level fusion & anterior ... plate lumbar discectomy." *Id*.

On March 21, 2012, Turner, who was complaining of left knee pain, was examined by Michael G. Holman, MD. *Id*. at 566–68. Holman found that Turner had "[f]ull range of motion bilaterally but ... limited flexion," and noted that the symptoms were "highly suggestive of meniscus tear or a loose body in the knee." *Id*. at 567. Holman prescribed an NSAID and use of a brace. *Id*.

### E. May 3, 2012, Letter and Subsequent Review

On May 3, 2012, Hartford sent Turner a letter stating, in relevant part:

> Your LTD benefits became effective on 10/30/2010. Effective 10/30/2012 you must be considered Disabled as outlined in the second portion of the above definition in order to continue to be eligible for LTD benefits.
>
> Please be advised that this office has initiated a review to determine if you will qualify for benefits on and after 10/30/2012. When we have completed our review, we will notify you regarding our determination.

AR-217.

Later that month, on May 30, 2012, Turner underwent an MRI on his right knee. *Id*. at 570. The MRI revealed a "[t]ear of the posterior horn of the medial minisicus" and "[s]ignificant degenerative changes of the patellofemoral joint with joint space narrowing, cartilage loss, and osteophyte formation." *Id*.

On July 20, 2012, Turner presented to Holman with "[p]ainful triggering in the right thumb," which Holman attributed to tendonitis. *Id*. at 557. Holman performed an injection on Turner's thumb and made an appointment for Turner to undergo surgery. *Id*. at 558.

On September 28, 2012, Hartford sent Turner a letter stating, in relevant part, that he was determined to have met "the policy definition of Disability and that you will continue to qualify for benefits on and after 10/30/2012." *Id*. at 210.

### F. 2013 Voice Problems

On January 18, 2013, Turner returned to Schweinfurth complaining of "persistent hoarseness." AR-534. Schweinfurth performed a flexible laryngoscopy and observed that Turner's "left true cord was severely paretic although it did have some movement. Glottic closure was incomplete. The immediate trachea and subglottis were widely patent. There were no masses or suspicious lesions seen." *Id*. at 535. The notes from the visit reflect an assessment of "iatrogenic left TVC paresis." *Id*. Schweinfurth developed a plan for Turner to receive an "injection to improve voice" and noted that Turner, who was a smoker, would "need speech therapy postop for improvement in voice overall." *Id*. at 534–35.

On January 29, 2013, Turner returned to Vohra complaining of "neck and back pain." *Id*. at 548. Vohra noted that Turner, who had recently discontinued his hydrocodone, "continues to have cervical and lumbar paraspinal spasm. He has fairly good cervical range. Lumber range is diminished 25 percent in lateral flexion and extension." *Id*. Vohra found that, because Turner was "doing well off of his pain medications," he would "not reinitiate his hydrocodone." *Id*. However, Vohra deemed it appropriate to direct Turner to "follow up with his family physician for refills on the Zoloft." *Id*. Vohra noted that "[f]rom a pain perspective, I will see him back on an as needed basis." *Id*.

On February 4, 2013, Turner underwent a microdirect laryngoscopy of the left true vocal cord, and an injection with Cymetra. *Id*. at 463. During the procedure, the surgeon noted a "slight atrophy of the left true vocal cord." *Id*. At a follow-up appointment on March 1, 2013, Turner reported "that his swallow has improved [but that] he still has a significantly hoarse voice [and] feels as if he is running out of breath when speaking." *Id*. at 539. Turner underwent another laryngoscopy which revealed "continued ... evidence of left true vocal cord paresis with

9

evidence of recent cymetra injection. Glottic closure was complete. The immediate trachea and subglottis were widely patent." *Id*. Schweinfurth informed Turner that he felt "the strain and breathy quality to his voice ... is due to overcompensation with the recent cymetra injection and we feel that this will even out." *Id*. at 540.

### G. Recurrent Problems

On April 17, 2013, Turner attended a follow-up appointment with Holman, at which Turner complained that he had been suffering "severe left arm pain radiating down from his neck" for approximately two and a half weeks. AR-440. Turner reported that he had been off narcotics for three months and that it "hurts the same now as before." *Id*. Holman diagnosed Turner with cervical radiculopathy and ordered an MRI. *Id*. at 441. The MRI was performed on April 22, 2013, and revealed "mild diffuse disc bulge at the C3-C4 and C4-C5 disc level with bilateral foraminal narrowing." *Id*. at 450. The following day, Holman reviewed the MRI results with Turner, during which Turner complained that the pain was "about to drive him crazy." *Id*. at 439. Holman suggested Turner reinitiate his narcotic pain regime and, to this end, prescribed Turner hydrocodone. *Id*.

On April 19, 2013, Turner presented to Catherine Cheney, FNP, for a follow-up regarding his left vocal cord paresis. *Id*. at 541. Turner reported that he had a "significantly hoarse voice" but that he was "not having any difficulties in breathing or swallowing." *Id*. Cheney observed continued evidence of left true vocal cord paresis but noted, "We feel that his voice may improve with the vocal exercise, however we recommend that he does not do the exercises until he is medically cleared by his PCP to resume strenuous activities that involve his neck and left side of his arm." *Id*. at 542. Cheney also noted that she believed Turner would

"benefit from using a voice amplifier in the interim to decrease the straining that he is encountering." *Id*.

During a May 17, 2013, telephone call with Hartford, Turner stated that, following his throat procedure, his "[t]hroat is not doing better" but that he had his voice back. *Id*. at 080. Turner further advised that he "was having difficulty with the stretches and movement" of his voice therapy so ceased the therapy. *Id*. Turner said that his neck and lower back issues are the "primary conditions impacting his ability to work." *Id*. Finally, Turner stated that: (1) he is able to drive most days but tries to do so as little as possible because driving aggravates his lower back; (2) he smokes; and (3) "his day is mostly spent at home unless he goes to kids school for school event." *Id*. at 080–81.

## H. 2013 Pain Treatment

Holman completed an APS for Turner on June 13, 2013. AR 545–46. The APS states that Turner: (1) can sit for six hours a day, stand for one hour a day, and walk for one hour a day; (2) can lift/carry 1 to 10 pounds with no restriction; (3) can lift/carry 11 to 20 pounds occasionally; (4) can never lift/carry anything heavier than twenty pounds; (5) can occasionally bend at the waist; (6) can never kneel/crouch; (7) can occasionally drive; (8) can never reach above the shoulder; (9) can frequently reach at waist level; (10) can occasionally reach below waist level; and (11) can finger/handle without restriction. *Id*. at 546. The report noted that Turner did not "have a psychiatric/cognitive impairment." *Id*.

On June 20, 2013, Turner underwent a cervical epidural steroid injection performed by Jeff Summers, MD, at NewSouth NeuroSpine Pain Center. *Id*. at 422. Summers performed a second injection on July 29, 2013. *Id*. at 420. Also in July 2013, Turner underwent physical therapy at NewSouth. *Id*. at 412.

On July 29, 2013, Turner returned to Vohra complaining of "an increase in neck pain, left perispacular pain, and left arm pain." *Id*. at 415. Vohra noted that, "[u]pon palpation, he has mild to moderate left cervical paraspinal spasm. He has positive Spurling's on the left." *Id*. Vohra observed that Turner's "complaints seemed to be a bit more posterior than one would expect for C5." *Id*. Vohra's notes include the statement: "I am ... going to place him in physical therapy. Hopefully he will improve with treatment. If he does not, we may need to consider a myelogram and EMG." *Id*.

On September 10, 2013, Turner was seen at NewSouth by Alice Messer, FNP-BC. *Id*. Turner reported that, following the July 2013 visit to NewSouth, he had "excellent relief, but then ... felt like it caused some of his headache complaints [so he] discontinued physical therapy." *Id*. Turner complained of "mid back pain" and "a new issue with pain radiating around the right side of his abdomen." *Id*. Turner reported discontinuing Effexor because "he did not feel as though he was depressed." *Id*. Messer encouraged Turner to continue on Effexor but Turner responded he no longer "wished to pursue psychiatric management for his depression." *Id*. Messer further recommended an MRI on Turner's spine. *Id*.

Turner underwent an MRI on September 12, 2013, which revealed "severe ligamentum flavum, hypertrophy and facet atropathy at the T-10-11 disc level resulting in 50% narrowing of the area of the spinal canal." *Id*. at 409. Additionally, the reviewing physician, Ron Christian, M.D., observed "[n]o evidence of disc herniation." *Id*.

On October 30, 2013, Turner spoke with a Hartford representative and stated his lower back was causing "problems moving around, standing up straight and sitting up in a chair for more than 30 minutes." *Id*. at 069. Turner also reported he was "[u]nable to walk more than 100 yards without being in pain afterwards," that he had limited range of motion in his neck, and that

if he moved his neck too much he developed pain in his left arm. *Id.* Turner stated that three

times a week he picks his kids up from a bus stop approximately a quarter of a mile away. *Id.* at

070. He also reported that once a month he visited his mother, who lived approximately thirty

miles away. *Id.*

### I. December 5, 2013, Evaluation and Termination of Benefits

On December 5, 2013, Vohra responded to a questionnaire provided by Hartford

regarding Turner's condition. AR-408. Vohra's response stated that Turner would be able to

perform "full time work that is primarily seated with the ability to change positions as needed

with minimal and/or lifting up to 10 lbs" so long as the lifting was required "rarely." *Id.*

On December 13, 2013, Summit Investigations, Inc., at Hartford's direction, conducted

video surveillance on Turner. *Id.* at 900–01. During the surveillance, the investigator observed

Turner drive approximately fifteen minutes from his home to a Burger King drive-through. *Id.* at

904. After going through the drive-through, and approximately twenty-three minutes after

leaving home, Turner pulled into a gas station, exited his vehicle, and entered the store. *Id.* at

904–05. Turner spent approximately four minutes in the store and then exited carrying two

plastic bags in his left hand. *Id.* at 905. Turner then drove approximately thirteen minutes home.

*Id.* A report of the surveillance and a corresponding video were provided to Hartford on

December 18, 2013. *Id.* at 906.

On January 8, 2014, Hartford completed an "Employability Analysis Report" ("EAR")

on Turner "for the purpose of determining his current employability." *Id.* at 396. The EAR

stated:

> The functional capabilities used in this analysis are based on the medical
> statement dated 12/3/13 completed by Dr. Vohra advising Mr. Turner is capable
> of full time sedentary work function; with the ability to lift up to 10lbs rarely, and

should never bend or kneel. Dr. Turner [sic] is advising these abilities are permanent.

*Id*. Based on Turner's work history and the capabilities identified by Vohra, the EAR, employing the Occupation Access System ("OASYS"),[4] identified the occupation of "skip tracer" as a profession for which "it is very reasonable Mr. Turner possesses the functional capabilities, skills and education to perform …." *Id*. at 397. The report also noted such profession exceeded the required earnings potential for Turner. *Id*.

On January 14, 2014, Turner presented to Vohra with continued back pain. *Id*. at 331. Turner informed Vohra that his physical activity had recently increased because his wife was away from home and that he had experienced "severe stiffness" in his back. *Id*. Vohra conducted a physical examination during which he found "mild cervical paraspinal spasm" and diminished thoracic and lumbar range. *Id*.

On January 17, 2014, Hartford informed Turner by letter that he was no longer entitled to LTD benefits because he was qualified and able to perform the occupation of skip tracer and was not, therefore, disabled from performing "Any Occupation" as required by the Policy. *Id*. at 168–172.

### J. Post-Denial Treatment and Appeal

On February 27, 2014, Turner was re-evaluated by Summers. AR-344. Summers noted that Turner reported a current pain level of 6/10, and complained of "worse pain fluctuat[ing] between his between his neck and his low back." *Id*. Summers recommended an MRI of Turner's lower spine. *Id*.

---

[4] OASYS "is a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles …." AR-396.

On March 17, 2014, Turner presented to Vohra with "ongoing numerous orthopedic complaints," including "thoracic pain with intermitted radiating pain," "significant right shoulder pain," and "back pain [with] intermittent bilateral lower extremity radiating pain." *Id*. at 328. The physical examination revealed "right mid-lower thoracic paraspinal spasm as well as bilateral lower lumbar spasm of moderate severity[, and] a poor thoracic segmental motion and poor lumbar range of motion." *Id*. However, Vohra observed "[s]trength is normal throughout as is sensory exam." *Id*. The same day, Vohra issued a note stating "Mr. Turner is disabled from any employment. This is permanent." *Id*. at 307.

Turner underwent a lumbar spine MRI on March 20, 2014. *Id*. at 319. In evaluating the MRI, Richard McCarthy, the reporting physician, noted:

> Postsurgical changes at L4-5 with mild bilateral foraminal stenosis due to diffuse disc bulge. Mild bilateral foraminal stenosis at L5-S1 due to diffuse disc bulge. Mild to moderate spinal and foraminal stenosis at the L3-4 which appears to be slightly more severe than on the last exam.

*Id*.

On March 25, 2014, Turner was re-evaluated by Schweinfurth. *Id*. at 392. Schweinfurth's report reflects that Turner was "[b]reathing comfortably without stridor. Voice is slightly hoarse, yet audible, with improved volume and strength." *Id*. Schweinfurth performed a laryngoscopy and observed "continued ... evidence of left true vocal cord paresis with medialization s/p cymetra injection, and scarring from prior intubations." *Id*. Turner was diagnosed with vocal cord paralysis, unilateral partial Dysphonia; however, the notes reflect that "[i]t was discussed that we are pleased that he has done well …." *Id*.

A March 27, 2014, MRI on Turner's left knee revealed: (1) a "[s]ignificant abnormality of the articular surface cartilage of the patella;" (2) a "[c]omplex tear of the posterior horn of the

medial meniscus;" and (3) "[s]light loss of articular surface cartilage with no significant subchondral changes." *Id*. at 323.

On July 8, 2014, Turner appealed Hartford's January 2014 decision that he was no longer entitled to LTD benefits. *Id*. at 293. In support of his appeal, Turner relied on: (1) the December 11, 2013, letter from the Social Security Administration stating that Turner's "disability is continuing," [AR-300]; (2) Vohra's December 5, 2013, response to Hartford's questionnaire; (3) the March 17, 2014, note from Vohra stating that "Mr. Turner is disabled from any employment. This is permanent;" (4) various medical records from Vohra and Summers; (5) various MRI results; and (6) medical records related to his vocal chords. *Id*. at 293–94. In his appeal letter, Turner noted that Vohra issued his March 17, 2014, note after Turner "discuss[ed] Hartford's] decision with him." *Id*. at 293.

On July 25, 2014, Turner returned to NewSouth and underwent an evaluation by Messer. *Id*. at 283–84. At the appointment, Turner complained of "severe thoracic spine pain as well as low back pain." *Id*. at 283. Messer noted that Turner's "[p]revious MRI of the lumbar spine showed mild disc protrusions with mild stenosis at L4-L5." *Id*. Messer's physical examination revealed "some thoracic tenderness" and "pain over the right SI and right buttock. Lumbar range of motion is guarded but fair. DTRs in the lower extremities are 1/4. Strength is 5/5 in all muscle groups." *Id*.

### K. Consultant Report

On September 17, 2014, Hartford completed a "Medical Consultant – Referral Form" requesting information on Turner's alleged disability. AR-280. The form listed Vohra as Turner's primary attending physician, included a request for "all medical records received as of

the date of this referral," and asked for an "independent opinion" of Turner's functionality. *Id*. at 280–81.

On October 9, 2014, Ben Hur P. Mobo, a physician licensed in Internal Medicine and Preventive Medicine/Occupational Medicine, submitted to Hartford a report on Turner's disabilities. *Id*. at 270–75. Mobo's report reflects that he reviewed Turner's medical records but "was unable to speak with Dr. Vohra after three attempts." *Id*. at 272–73. Based on his review of Turner's medical records, Mobo concluded:

> [T]he clinically reasonable restrictions [for Turner] from 01/18/2014 include:
>
> - Sitting is unrestricted
> - Walking and standing combined up to 30 minutes at a time and up to a combined two hours total in a workday due to the left knee findings noted above.
> - The claimant can crouch, kneel, crawl, and squat occasionally.
> - Bending and climbing stairs/ladders are unrestricted.
> - Reaching overhead, at waist level and below waist level are unrestricted.
> - Unrestricted fingering, handling and keyboarding.
> - Lifting and carrying up to 25 pounds occasionally and frequently up to 15 pounds.
>
> From 01/18/2014 to the present the claimant's condition has not changed significantly.

*Id*. at 273–74. Regarding Turner's ability to speak, Mobo found:

> Based on review of the medical information as of 01/18/2014 the claimant does not have any restrictions/limitations regarding his vocal cords. The claimant was initially seen for issues concerning his vocal cords in 07/2005. In 07/2006 he was instructed to return to ENT for this issue on as-needed basis. He was not seen again for this until 01/18/2013. The 01/18/2013 notes reported his left vocal cord paresis was deemed iatrogenic. The lack of left-sided findings in 2005 and 2006 does not support impairment from 01/18/2014 through the present. There are no records regarding his vocal chords past 01/18/2014 and thus no supporting evidence of impairment ....

*Id*. at 274. At the conclusion of his report, Mobo certified, among other things:

> \* I have no material professional, familial, financial or other affiliation, relationship or conflict of interest with or related to the subject matter that is being recommended and which I have reviewed ....
> \* My compensation for performing the subject review is not dependent, in any way, on the outcome of the case[.]

> \* I have current, relevant experience and/or knowledge to render a determination for cases under review[.]
>
> \* I have a scope of licensure or certification that typically manages the medical condition, procedure, treatment or issue under review[.]

*Id*.

## L. Final Termination of Benefits

Hartford affirmed its termination of Turner's benefits on October 13, 2014, citing its "independent review of the medical records received to date, your self-reported symptoms, the report from Dr. Mobo, … review by the Rehabilitation Case Manager and the policy provisions." AR-158–61. In affirming the termination, Hartford noted that "in the Independent Medical Review report Dr. Mobo opined that you were capable of working with restrictions and limitations and the Rehabilitation Case Manager has identified an occupation that you would be capable of performing." *Id*. at 160. Hartford further wrote that it had considered Turner's SSA determination as "one piece of relevant evidence" but that the evidence was not determinative because "[t]he standards governing receipt of these public and private benefits are different in critical ways." *Id*. Specifically, Hartford noted "the SSA does not conduct an analysis of skills that may be transferrable to other occupations. The Hartford does a transferrable skills analysis to determine whether an individual's prior experience and skill would allow him/her to perform an occupation with minimal on-the-job training." *Id*.

On November 5, 2014, Vohra responded to a questionnaire sent to him by Mobo, which was dated October 7, 2014. *Id*. at 258. Vohra's response states that, as of January 18, 2014, Turner had the following work capacity: (1) "no prolonged sitting – requires frequent position changes every 30 minutes;" (2) "no prolonged walking;" (3) "no prolonged standing;" (4) "avoid" bending, crouching, kneeling, and overhead reaching; (5) occasional reaching at and

below the waist; and (6) "frequent" fingering, handling, and keyboarding.  *Id*. at 258–59.  In

addition to asking for Turner's physical limitations, the questionnaire included the inquiry:

> Mr. Turner reports vocal cord injury from surgery in 5/2005. What was the impairment or specific injury? Does he continue to have impairment from the 5/2005 injury – if any – as of 1/18/14? If so, what would have [sic] any restrictions and/or limitations regarding his vocal chords

*Id*. at 259.  Vohra responded by stating, "recent vocal cord surgery – UMC."  *Id*.  Vohra stated

that the identified restrictions were based on a history of C4-C7 fusion, thoracic stenosis, "vocal

cord injury" and "unable to tolerate employment – disabled."  *Id*.

On November 10, 2014, Mobo issued an addendum to his report, stating that "Dr.

Vohra's responses do not alter my prior assessment as there is no new compelling information in

Dr. Vohra's responses that would alter my initial opinion and the restrictions/limitations I

outlined in my initial report."  *Id*. at 248.

On March 19, 2015, Hartford issued a letter to Turner's then-attorney, stating that it had

considered Vohra's response and Mobo's addendum.  *Id*. at 154–55.  The letter states that "[t]he

additional information received for review from Dr. Vohra did not alter our decision of

10/13/14."  *Id*. at 155.

## IV
## ERISA Standard of Review

In enacting ERISA, Congress sought:

> to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b).  To this end, "ERISA comprehensively regulates, among other things,

employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide

medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987) (quoting 29 U.S.C. § 1002(1)).

Under ERISA, a participant or beneficiary in a regulated plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[D]istrict courts hearing complaints from disappointed ERISA plan members or their beneficiaries for the administrative denial of benefits are *not* sitting, as they usually are, as courts of first impression. Rather, they are serving in an appellate role." *McCorkle v. Metro. Life Ins. Co.*, 757 F.3d 452, 456 (5th Cir. 2014). In this role, a district court's review "is very narrowly restricted by ERISA and its regulations, as interpreted by the courts of appeals, and the Supreme Court …." *Id.* at 457.

"When, as here, the ERISA plan grants the administrator the discretion to interpret the meaning of the plan, [a court should] reverse an administrator's decision only for an abuse of discretion." *Porter v. Lowe's Cos., Inc.'s Bus. Travel Acc. Ins. Plan*, 731 F.3d 360, 363 (5th Cir. 2013). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342, 347 (5th Cir. 2016). Thus, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 307 (5th Cir. 2015).

"An ERISA claimant bears the burden to show that the administrator abused its discretion." *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349, 352 (5th Cir. 2015). "The burden of proof and the standard of review is the same whether the decision is an initial decision or a decision to terminate previously granted benefits." *Adams v. UNUM Life Ins Co. of Am.*,

No. H-04-2179, 2005 WL 2030840, at *32 (S.D. Tex. Aug. 23, 2005) (citing *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004)); *see Braddock v. Baker Hughes Inc. Long Term Disability Plan*, 461 F.Supp.2d 490, 500 (S.D. Miss. 2006) ("Plaintiff has the burden of proving that Hartford's decision to terminate his long-term disability benefits constituted an abuse of discretion.").

## V
## Motion to Strike

Before reviewing the propriety of Hartford's decision to terminate Turner's LTD benefits, the Court must first address Hartford's motion to strike. Hartford seeks to strike from Turner's motion for summary judgment "references and arguments based on medical records that were never submitted to Hartford or otherwise included as part of the Administrative Record …." Doc. #32 at 3. These references and/or arguments are:

- "Dr. Davis noted in July of 2013 that Mr. Turner was the only recurrent laryngeal nerve palsy that Dr. Davis had treatment in over 2,000 cases that was as permanent and persistent as Mr. Turners'." (Doc. 28 at p. 12).

- "Mr. Turner . . . underwent arthroscopic knee surgery with Dr. Kennedy in February of 2015." (*Id.*)

- Plaintiff "continues to treat with Dr. Angela Koestler for chronic pain and depression." (*Id.*)

*Id.* As mentioned above, Turner did not respond to the motion to strike.

"When conducting abuse of discretion review of a denial of benefits based on an administrative record, [the Fifth Circuit has] generally require[d] that the scope of review be limited to facts known to the plan administrator at the time of the benefits decision."[5] *McDonald v. Hartford Life Grp. Ins. Co.*, 361 F. App'x 599, 606 (5th Cir. 2010) (citing *S. Farm Bureau Life*

---

[5] However, a district court may consider "evidence ... that assists the district court in understanding the medical terminology ... related to a claim." *Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pitt.*, 215 F.3d 516, 521 (5th Cir. 2000).

*Ins. Co. v. Moore*, 992 F.2d 98, 102 (5th Cir. 1993)).  This Court agrees that Turner may not rely on medical records outside the administrative record.  However, "it is more appropriate to disregard, rather than to strike," improper arguments.  *Owen v. Young*, No. 4:15-cv-4087, 2016 WL 915065, at *2 (D.S.D. Mar. 10, 2016); *see In re Tomahawk Oil*, No. 14-155055, 2016 WL 4435609, at *1 (W.D. Okla. Aug 19, 2016) ("Rather than file a motion to strike, Trustee should have incorporated these arguments in his objection to Mustang's motion for summary judgment and in his reply to Mustang's objection to his motion for summary judgment as the Court has the ability to disregard inadmissible portions of any affidavit submitted in connection with summary judgment.").  Accordingly, rather than strike individual sentences from Turner's motion, the Court will simply disregard those portions of Turner's motion which are the subject of Hartford's motion to strike.  *See generally Jefferson v. Christus St. Joseph Hosp.*, 374 F. App'x 485, 489 (5th Cir. 2010) ("[W]e find no abuse of discretion in the district court's decision to disregard rather than strike the EEOC determination letter ....").  Hartford's motion to strike, therefore, will be denied as moot.

## VI
## Analysis

The evaluation of an ERISA claim decision is ordinarily resolved in two steps.  *Porter*, 731 F.3d at 364.  First, the Court asks whether the decision was legally correct.  *Id*.  Second, the Court asks whether the administrator abused its discretion.  *Id*.  A court may, however, skip the first step if it "can determine the decision was not an abuse of discretion," *High v. E-Sys., Inc.*, 459 F.3d 573, 577 (5th Cir. 2006); or if "the case does not turn on sophisticated [p]lan interpretation issues," *Kolodzaike v. Occidental Chem. Corp.*, 88 F.Supp.2d 745, 748 (S.D. Tex. 2000).  Because this case does not turn on sophisticated plan interpretation issues, the Court first reviews whether Hartford abused its discretion in terminating Turner's benefits.

"Abuse of discretion factors include: (1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Arm'rs Inc.*, 703 F.3d 835, 841 (5th Cir. 2013) (internal quotation marks omitted). A court should also consider whether the administrator had a conflict of interest. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 196 (5th Cir. 2015).

## A. Internal Consistency of Interpretation

Turner argues that Hartford "interpreted its policy definition of 'disability' to require Mr. Turner to have proven, to Hartford's satisfaction, that he could do no job, of any type, anywhere, in order to continue eligibility for his benefits." Doc. #36 at 2. Turner contends:

> The problem with Hartford's position is that the policy definition of disability does not place such a burden on Mr. Turner. No insured could ever meet a burden of proof if Hartford 1) does not have to credit to the opinions of the treating physicians confirming that the insured is permanently disabled from all employment; 2) Hartford can change the definition of disability to suit its purpose; 3) Hartford can ignore determinations of disability it forces the insured to pursue through the Social Security Administration, and, 4) Hartford can hire medical "reviewers" to determine that the insured should be able to do some type of work somewhere.

*Id.* Although it is less than clear, it appears Turner argues that Hartford improperly narrowed the Policy's definition of "Disability" to include all potential occupations, and contends that the Policy: (1) required Hartford to credit Turner's treating physicians; (2) required Hartford to credit the Social Security Administration's determination of disability; and (3) prohibited Hartford from retaining an independent reviewer. Hartford replies that "it is abundantly clear that Hartford utilizes the correct 'Any Occupation' definition in adjudicating Plaintiff's claim." Doc. #39 at 2.

As an initial matter, nothing in the record suggests that Hartford altered the definition of disability. As explained above, the Policy clearly conditioned the receipt of LTD benefits on a showing that Turner was unable to perform an occupation for which he was qualified and which had a satisfactory earnings potential. *See* AR-030. In terminating Turner's benefits, Hartford based its decision on the existence of a profession, skip tracer, for which it found Turner to be qualified and which met the requisite earnings potential. Furthermore, Turner points to nothing in the Policy (which explicitly granted Hartford discretion to interpret the relevant terms) which would have prohibited Hartford from crediting the opinions of the varying physicians and evidence in the manner it did.

In short, the Policy gave Hartford the right to terminate benefits upon a determination that Turner was able to perform an occupation which met a baseline salary requirement. Hartford terminated Turner's benefits after determining that Turner was able to perform such an occupation. Under these circumstances, the Court concludes that Hartford's interpretation of the Policy was internally consistent.

## B. Relevant Regulations

Neither party has introduced evidence or argument related to relevant regulations. Accordingly, the Court deems this factor neutral.

## C. Factual Background of the Determination

"With respect to the third factor, to find an abuse of discretion, this court must scour the record and the pleadings for any legal basis upon which the administrator could have based its interpretation." *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 346 (5th Cir. 2002), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–19 (2008) (internal quotation marks and alterations omitted); *see Kennedy v. Elecs. Pension Plan, IBEW*

No. 995, 954 F.2d 1116, 1124 (5th Cir. 1992)). Here, Hartford terminated Turner's benefits because it found that Turner was capable of performing the essential duties of a skip tracer and was not, therefore, unable to perform Any Occupation, as that term is defined in the Policy. In attacking the factual background of the determination, Turner argues that: (1) Hartford improperly relied on Vohra's December 5, 2013, opinion; (2) Hartford discredited the opinions of his treating physicians without reason; (3) the record evidence did not support a finding that Turner could perform all the essential duties of skip tracer; (4) Hartford wrongfully disregarded the Social Security Administration's determination of disability; and (5) Hartford failed to include restrictions arising from Turner's depression and vocal cord condition. Doc. #36.

## 1. The Questionnaire

Turner first argues that the questionnaire sent to Vohra, which was completed on December 5, 2013, was "calculated to give Hartford an opportunity to manipulate its own interpretation of Dr. Vohra's opinion." Doc. #28 at 11. Turner also states that the EAR's consideration of his restrictions "was obviously a gross over-read of the questionnaire …." *Id.*

The use of misleading or leading questions may render an opinion of lesser value or suggest that the administrator was not acting in good faith. *See Lain*, 279 F.3d at 347 (question "[e]quating ... disparate activities reflects plain lack of objectivity and an abuse of discretion by UNUM"); *Meyer v. UNUM Life Ins. Co. of Am.*, 96 F.Supp.3d 1234, 1252 (D. Kan. 2015) (finding abuse of discretion where administrator "relied on an opinion by Lambrew, a tainted, highly paid Unum contractor who rendered his opinion in response to leading questions and discounted physical test results").

The questionnaire Hartford provided to Vohra included six questions:

1) Please provide office notes for the period of 6/2013 to present to include any diagnostic test results, consultation reports, laboratory test results and any other information you feel is pertinent to the processing of this claim.
2) Do you feel your patient is capable of performing full time work that is primarily seated with the ability to change positions as needed with minimal and/or lifting up to 10lbs? If yes, when? _____ If no, please explain
3) What are your patient's current restrictions and limitations?
4) What is the maximum amount of weight your patient can lift/carry?
5) What is the current ICD-9 code?
6) From a functional standpoint, do you expect a fundamental or marked change in the future? If yes, when? If no, please explain.

AR-408. The Court finds these questions, which are largely open-ended, stand in stark contrast to the leading question in *Meyer*, which asked: "What is the medical relationship between the pre-ex illness/injury and the claimed disabling illness/injury? Please explain how and why this claimant's pre-ex illness/injury is a risk factor that led to the claimed disabling illness/injury." 96 F.Supp.3d at 1239. Unlike the question in *Meyer*, the questions presented to Vohra did not improperly suggest a desired conclusion.

Additionally, the questions are not misleading like the question in *Lain*. In *Lain*, the relevant question asked: "Lain, [an attorney], has indicated that she spends quite a bit of time at home doing research pertaining to her diagnosis. If she is able to do this research, what is it that is preventing her from performing the duties of her regular occupation?" 279 F.3d at 346. The Fifth Circuit held that "[t]his question unfairly equates amateur research conducted by a severely ill individual trying to find answers about her painful and incurable sickness with the kind of daily performance required of an attorney specializing in major sophisticated real estate and financial transactions." *Id*. The questions to Vohra contain no similar false equivalence. Accordingly, the Court does not believe that the questionnaire sent to Vohra was improperly tainted by leading questions.

Next, Turner does not specify how the functional capabilities in the EAR amounted to a "gross over-read" of the December 5, 2013, questionnaire. Vohra's completed questionnaire stated that Turner was "capable of performing full time work that is primarily seated with the ability to change positions as needed with minimal and/or lifting up to 10lbs" but that Turner could "lift/carry up to 10 lbs [only] rarely, [and could] never bend/kneel[] …." AR-408. The EAR listed Turner's capabilities as "full time sedentary work function; with the ability to lift up to 10lbs rarely, and should never bend or kneel." *Id*. at 396. Given the similar content of the descriptions, the Court concludes that the restrictions in the EAR accurately reflect the restrictions in the questionnaire.

## 2. Weight Afforded to Treating Physicians' Opinions

Turner argues that it was improper for Hartford:

> to disregard the opinions of the treating physicians – the same opinions that Hartford relied upon to determine disability in the first place and which were relied upon by the Social Security Administration to determine disability – in favor of a report Hartford paid to be prepared by an internal medicine doctor, not licensed in Mississippi with no expertise in neurosurgery, orthopaedics [sic], or ENT issues.

Doc. #28 at 9. Although Turner references "opinions of the treating physicians," he essentially bases his argument on Vohra's March 2014 statement that Turner is completely disabled. Hartford responds that, contrary to Turner's contention, it properly considered the opinions of Turner's treating physicians insofar as it relied on Vohra's December 5, 2013, opinion. Hartford further contends that its conclusions were consistent with the opinions of Holman.

In reaching a determination, "[p]lan administrators … may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). However, "ERISA does not require the opinions of treating physicians to be preferred over those of other physicians reviewing a file;

ERISA merely requires that the opinions of treating physicians, as with all evidence submitted by the claimant, actually be taken in account in an administrator's determination." *Love v. Dell, Inc.*, 551 F.3d 333, 337 (5th Cir. 2008). An "administrator, under the established standard of review that restricts the courts, [is] not obliged to accept the opinion of [treating] physicians. In this 'battle of the experts' the administrator is vested with discretion to choose one side over the other." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 513 (5th Cir. 2010).

In terminating Turner's benefits, it is clear Hartford did not discard the opinions of Turner's treating physicians. To the contrary, the EAR, which formed the basis of the termination, was expressly based on the restrictions set forth in Vohra's December 5, 2013, correspondence. The termination letter itself expressly cites Vohra's December 5, 2013, letter. AR-170.

While it is true that Vohra issued a second opinion, an administrator does not abuse its discretion when it refuses to credit a treating physician's retraction of an opinion when such retraction occurs after the physician learned of a denial of benefits. *See Pylant v. Hartford Life and Acc. Ins. Co.*, 497 F.3d 536, 540–41 (5th Cir. 2007) ("It is true that one of the treating physicians later retracted his statement ... but he only did so during the appeals process, after meeting with Pylant's attorney.") (emphasis omitted); *Barnes v. BellSouth Corp.*, No. 1:03-cv-16, 2003 WL 22231261, at *16 (W.D.N.C. Aug. 14, 2003) ("There is certainly nothing wrong with a physician assisting a disabled individual in obtaining benefits, but the change in tone in Dr. Burke's description of Plaintiff's impairments between October of 2001 and January of 2002 could appropriately be considered by Dr. Cohan and, by extension, Kemper in assessing the credibility of her opinions."). Additionally, so long as the medical opinion of a consulting physician is "arguably supported by the medical record," an administrator does not abuse its

discretion when it relies on such an opinion, even if it "conflicts with the claimant's treating physician. This is so even if the consulting physician only reviews medical records and never physically examines the claimant, taxing to credibility though it may be." *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 249 (5th Cir. 2007).

The record here is clear that Hartford rejected Vohra's March 2014 opinion in favor of Vohra's December 2013 opinion and Mobo's report and addendum. Insofar as Vohra's March opinion was issued after Turner spoke with Vohra about his denial of benefits, Hartford was within its discretion to give the later opinion less weight. Additionally, Mobo's opinion regarding Turner's restrictions was arguably supported by the medical record—specifically, as Mobo observed, the fact that "the examinations since 06/2013 indicate: 5/5 upper and lower extremity strength with normal bilateral grip strength, no thoracic disc herniation, negative straight leg raising, no give-away weakness in his thoracic or lumbar muscle groups, intermittent thoracic and lumbar spasm, and right-sided SI joint area tenderness." AR-273. Under these circumstances, Hartford did not improperly discard Vohra's March 2014 opinion or the opinion of any treating physician.[6]

---

[6] The Court rejects Turner's comparison of the facts of this case to those in *Pettway v. Prudential Ins. Co. of Am.*, No. 5:08-cv-283, 2009 WL 2973393 (S.D. Miss. Sep. 11, 2009). In *Pettway*, the district court found an abuse of discretion where an administrator:

> totally ignored the unrefuted evidence from the plaintiff's treating physicians and from the original doctor to whom they sent the plaintiff for an IME. They chose, instead, to rely on the report of an IME doctor, Dr. Polk, who saw the plaintiff on one occasion for less than an hour who herself relied on a video surveillance more than two years old to support her findings. Additionally, Prudential's occupational review or employment assessment and independent peer review relied on Dr. Polk's analysis almost exclusively, giving no credence to the treating physicians. Prudential never informed any of these doctors that they had attempted to conduct surveillance on the plaintiff on more than twenty occasions and only were successful in securing observations of the minuscule activities described above. None of the activities observed equate to the requirements of the vocational employment assessment performed by Prudential nor the training and education of the plaintiff in securing viable employment. Terminating the plaintiff's LTD benefits on the record before this court was arbitrary and capricious.

2009 WL 2973393, at *8. Unlike in *Pettway*, Hartford relied on the opinion of one of Turner's treating physicians in formulating its EAR, not on a consulting physician. Furthermore, Hartford only attempted a single surveillance, which was not provided to the consulting physician.

### 3. Qualification to Perform Skip Tracer

Turner argues that "Harford completely fails to demonstrate that [he] is not prevented from performing one or more of the Essential Duties of even a skip tracer position. Hartford just assumes that the Court will somehow determine the Essential Duties of a skip tracer position and then somehow determine that Mr. Turner is not prevented from performing one or more of the essential duties of that job." Doc. #36 at 6. In this regard, Turner notes that "Mobo did not tell Hartford that Mr. Turner could perform all of the essential duties of a skip tracer position. Dr. Mobo never reviewed any aspect of a skip tracer position or any other alleged occupation." *Id.* at 9.

As explained above, Hartford based its conclusion regarding Turner's ability to perform the essential duties of the skip tracer analysis on the EAR, based on OASYS, which concluded that "it is very reasonable Mr. Turner possesses the functional capabilities, skills and education to perform th[e] occupation ...." AR-397. Courts have routinely held that "reliance upon an EAR and a system like OASYS is an acceptable and reasonable procedure for applying Policy definitions to a particular record." *Tortora v. Hartford Life & Acc. Ins. Co.*, 162 F.Supp.3d 520, 525–26 (D.S.C. 2016) (collecting cases). While the EAR did not explicitly delineate the essential duties of a skip tracer, it clearly stated that Turner possessed the capabilities, skills, and education to perform the job. It was more than reasonable then for Hartford to conclude, based on this statement, that Turner was capable of performing the essential duties of the skip tracer occupation.

### 4. Impact of Social Security Determination

Turner argues that Hartford "completely ignored" the SSA determination of disability and that such an action "can, itself, render the decision arbitrary and capricious." Doc. #28 at 14.

"[B]ecause the eligibility criteria for SSA disability benefits differs from that of ERISA plans, while an ERISA plan administrator should consider a SSA determination, it is not bound by it." *Hamilton v. Standard Ins. Co.*, 404 F. App'x 895, 898 (5th Cir. 2010). So long as the administrator provides a satisfactory reason for discarding the SSA disability determination, there is no abuse of discretion in failing to credit such determination. *Id.* The threshold for providing a satisfactory reason is very low. *See Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 471 n.3 (5th Cir. 2010) ("We do not require Hartford to give any particular weight to the contrary findings; indeed, Hartford could have simply acknowledged the award and concluded that, based on the medical evidence before it, the evidence supporting denial was more credible.").

In this case, Hartford deemed the SSA determination to be "relevant evidence" but ultimately determined that the record evidence supported a finding of no disability under the terms of the Policy. AR-160. This conclusion was within Hartford's discretion. *See Schexnayder*, 600 F.3d at 471 n.3.

### 5. Voice and Depression Restrictions

Turner also contends that "the Record is ... clear that he has additional disability associated with his permanent vocal cord injury orthopedic injuries and depression." Doc. #28 at 12; Doc. #36 at 10–12. Hartford responds that the administrative record does not support Turner's claim. Doc. #39 at 7–8.

While the record reveals Turner suffered from depression symptoms, the record also reveals that the condition was effectively treated by anti-depressants, which Turner voluntarily discontinued. More important, no physician ever opined that the depression restricted Turner's ability to work. To the contrary, Holman and Vohra (on two separate occasions) reported that

Turner did not suffer from a cognitive or psychiatric impairment. AR-546, 663, 717. Under these circumstances, the Court concludes that the record does not support a finding that Turner is subject to a work restriction due to his depression. *See generally Ecklund v. Continental Cas. Co.*, 415 F.Supp.2d 1353, 1369 (N.D. Ala. 2005) ("The issue is not whether plaintiff suffers from any certain condition; instead, the court must determine whether plaintiff satisfied the definition of 'disability' under the CSC plan.").

As for Turner's voice condition, Hartford, in denying Turner's appeal, relied on its independent review of the medical records and on Mobo's conclusion that Turner did "not have any restrictions/limitations regarding his vocal chords." AR-159. The medical evidence supports this conclusion. Although Turner suffers from a left vocal cord paresis and has complained of a hoarse voice and throat pain following surgery, no physician has ever identified a specific related restriction arising from these conditions.[7] To the contrary, Turner's ENT opined that he expected Turner's voice problems to "even out" following the cymetra injection. *Id*. at 540. The record reveals that Turner's condition did, in fact, even out, approximately two months later when Turner informed Hartford that he had his voice back. *Id*. at 080. While Turner contemporaneously complained of problems with his throat, there is nothing in the record which suggests what these problems were, or how they impacted his work. Accordingly, the Court concludes that there is no evidence Turner suffered from a disability related to his vocal cord paresis.

## 6. Summary

Hartford terminated Turner's benefits because it determined that he was able to perform the essential duties of the occupation of skip tracer. Hartford based this conclusion on an EAR

---

[7] In response to Mobo's questionnaire, Vohra listed Turner's vocal cord paresis as a condition contributing to Turner's alleged disability. However, Vohra did not specifically identify a restriction arising from the paresis.

report which utilized restrictions provided by Turner's treating physician. While Turner's treating physician subsequently updated the opinion underlying the EAR, Hartford was entitled to, and did, reject the update based on the report and an addendum of an independent consulting physician which set forth work capabilities less restrictive than those used in the EAR. The consulting physician's opinion was arguably supported by the medical record. Under these circumstances, the Court concludes that the factual background of Hartford's determination weighs against a finding of abuse of discretion.

### D.  Conflict of Interest

If the administrator has a conflict of interest, the court must "weigh the conflict of interest as a factor in determining whether there is an abuse of discretion in the benefits denial …." *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 247 (5th Cir. 2009). However, this factor is not treated as significant if the claimant offers "no evidence to suggest that it affected the benefits decision, such as a history of biased claims administration." *White v. Aetna Life Ins. Co. of Hartford Conn.*, 559 F. App'x 418, 420 (5th Cir. 2014).

Turner argues that Hartford has a structural conflict of interest in administering the plan because it both evaluates claims and pays benefits. Doc. #36 at 12–15. Hartford does not dispute that a conflict of interest exists but contends that the conflict, standing alone, does not justify upsetting its decision. Doc. #39 at 7–8.

"Where ... the employer who funds the plan also determines eligibility for benefits, a structural conflict of interest exists." *Holland*, 576 F.3d at 248. Where such a conflict exists, "the specific facts of the conflict will dictate its importance." *Id*.

> The conflict of interest ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less

important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* at 248–49 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). In addition to the steps outlined above, an administrator desiring to reduce potential bias may "submit applicants' records to independent medical professionals who have affirmed that they have no conflict of interest and that their compensation is not dependent in any way on the outcome of the case." *Id.* at 249 (internal quotation marks omitted). Conversely, where the administrator takes steps that are procedurally unreasonable, the conflict of interest factor should be given greater weight. *Schexnayder*, 600 F.3d at 471.

In this case, Turner contends the structural conflict of interest should be given greater weight because Hartford's "bizarre refusal to recognize Dr. Vohra's affirmative statement of disability (which Hartford calls a 'change of heart') as well as the determination of the Social Security Administration in favor of Dr. Mobo's report ... demonstrate[s] an obvious conflict of interest." Doc. #36 at 13–14.

For the reasons above, the Court concludes that Hartford's decision to disregard Vohra's March 2014 "affirmative statement of disability" was not "bizarre" but rather a proper exercise of Hartford's discretion. And, while an administrator's "failure to address" a SSA determination may justify giving the conflict of interest factor extra weight, *Schexnayder*, 600 F.3d at 471; this rule does not apply when, as here, the administrator gives "express consideration to the decision of the SSA," *Mattson v. Aetna Life Ins. Co.*, 928 F.Supp.2d 905, 917 (S.D. Tex. 2013). Accordingly, because Turner has offered no evidence which shows that the conflict of interest

affected the claims decision, the conflict of interest is only entitled to little weight. *White*, 559 F. App'x at 420.

## E.  Summary

As explained earlier, "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Killen*, 776 F.3d at 307 (citation omitted).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted) "A decision is arbitrary and capricious only if it is made without a rational connection between the known facts and the decision or between the found facts and the decision." *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 508 (5th Cir. 2013) (internal quotation marks omitted).

For the reasons above, and upon consideration of the relevant factors and the parties' arguments, the Court concludes that Hartford's termination of benefits was supported by substantial evidence and was not arbitrary and capricious.  Mobo's report and addendum; Vohra's December 5, 2013, opinion; and the EAR; constitute such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that Turner could perform all the essential duties of a skip tracer.  Similarly, the Court finds that this conclusion has a rational connection to the known facts and to the facts found in Hartford's decision. Accordingly, Hartford's decision was not an abuse of discretion.  Having found no abuse of discretion, the Court need not consider whether Hartford's decision was legally correct.  *High*, 459 F.3d at 577.  Hartford's decision to terminate Turner's benefits must be affirmed.

**VII**

**Conclusion**

It is **ORDERED**:

1.      Hartford's motion to strike [32] is **DENIED as moot**.

2.      Hartford's motion for summary judgment [24], which this Court construes as a motion for judgment on the administrative record, is **GRANTED**.

3.      Turner's motion for summary judgment [27], which this Court construes as a motion for judgment on the administrative record, is **DENIED**.

4.      A final judgment consistent with this opinion will be issued separately.

**SO ORDERED**, this 10th day of March, 2017.

**/s/ Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**